Timothy Jude **LABRAKE**, Appellant,

v.

**STATE** of Alaska, Appellee.

No. A–9189.

Court of Appeals of Alaska.

Feb. 2, 2007.

---

**1.** 658 P.2d 141 (Alaska App.1983).

**2.** *Nygren*, 658 P.2d at 146.

Marcia E. Holland, Assistant Public Defender, Fairbanks, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Diane L. Wendlandt, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and David W. Márquez, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

Timothy Jude LaBrake appeals the superior court's dismissal of his petition for post-conviction relief. For the reasons explained here, with one exception, we agree with the superior court that LaBrake failed to present a prima facie case for post-conviction relief—and we therefore affirm the superior court's dismissal of LaBrake's petition in all respects but one. The one exception is that, for the reasons explained below, we conclude that LaBrake presented a prima facie case that he is entitled to reinstate his earlier sentence appeal.

*Background facts and procedural history of this litigation*

In 1999, LaBrake was indicted on two counts of second-degree sexual abuse of a minor,[1] based on allegations that he engaged in sexual contact with a fourteen-year-old girl, J.M. The State alleged that this sexual abuse occurred after J.M.'s parents allowed LaBrake to take J.M. and her ten-year-old

---

1. AS 11.41.436(a)(5).

sister to a mining camp outside of Manley Hot Springs.

Here is a summary of the State's case, as revealed by the record:

The parents of J.M. and her sister entrusted LaBrake with the task of driving the two girls to Manley Hot Springs. The plan was for the girls to spend time at a mining claim that was owned by Larry and Linda Cotton, who were long-time friends of the family. (LaBrake was working a mining claim nearby.) LaBrake took the girls to his own mining claim rather than to the Cottons' claim. When the Cottons heard LaBrake's vehicle and came by his camp, LaBrake refused to relinquish the girls to the Cottons. An altercation ensued, and the Cottons ultimately contacted the authorities.

Sometime later, while LaBrake and the girls were spending the night in his camper, LaBrake engaged in sexual contact with J.M. When LaBrake was later interviewed about this incident, he told investigators that fourteen-year-old J.M. had "come on to him" and that he had allowed himself to be seduced. LaBrake acknowledged that he had touched J.M.'s thigh and that he might have rubbed her genitals; he was not sure. LaBrake further stated that if J.M.'s younger sister had not awakened and interrupted this activity, he probably would have had sexual intercourse with J.M.

When Larry Cotton was interviewed by the troopers, he described how LaBrake told him that he had placed his hand between J.M.'s legs, that he had touched the top of her breast, and that if J.M.'s younger sister had not awakened, he would not have stopped. LaBrake also told Cotton that he was thinking about committing suicide, and that he would have to go to jail for what he had done with J.M.

At the grand jury hearing, J.M. testified that LaBrake had touched her genitals, and J.M.'s younger sister testified that she had awakened to see LaBrake "messing" with her sister's genitals and breasts. In addition, Linda Cotton testified that LaBrake had told her and her husband that he had touched J.M., and that he knew it was wrong,

but that he had only "felt of" J.M. (as opposed to engaging in intercourse with her).

Second-degree sexual abuse of a minor is a class B felony carrying a maximum term of imprisonment of 10 years.[2] LaBrake was a first felony offender. Under Alaska's pre–2005 sentencing law, LaBrake would not face a presumptive term of imprisonment if he was convicted. Rather, he would be sentenced under former AS 12.55.125(k)(2), which set a ceiling of 4 years to serve (the presumptive term for a second felony offender convicted of the same offense) unless the State proved one or more of the aggravating factors listed in AS 12.55.155(c) or extraordinary circumstances as defined in AS 12.55.165.

(See *Surrells v. State,* 151 P.3d 483 (2006); and *Dayton v. State,* 120 P.3d 1073, 1079–1081 (Alaska App.2005)—cases in which we fully analyzed this sentencing statute.)

LaBrake's case was ultimately resolved with a plea bargain. Under the terms of this plea agreement, LaBrake pleaded no contest to one of the counts, and the State dismissed the other. The parties agreed that LaBrake would receive no more than 4 years to serve (*i.e.,* the ceiling set by AS 12.55.125(k)(2) in the absence of aggravating factors or extraordinary circumstances), although LaBrake agreed that the State would be free to ask the superior court to impose additional suspended imprisonment.

In advance of LaBrake's sentencing, the State filed notice that it was proposing two aggravating factors under AS 12.55.155(c). The first of these aggravators was (c)(5): that LaBrake knew or should have known that J.M. was a particularly vulnerable victim. The second of these aggravators was (c)(18)(B): that LaBrake was being sentenced for one of the sexual felonies defined in AS 11.41.410—458, and that he had engaged in other conduct prohibited by AS 11.41.410—460 involving another victim—to wit, his own daughter.

This second aggravator was based on the fact that LaBrake was investigated in 1985 by the police in Sheridan, Wyoming on suspi-

---

**2.** AS 11.41.436(b); AS 12.55.125(d).

cion that he had sexually abused his daughter. This investigation was commenced after his daughter (who was not quite three years old at the time) reported that LaBrake had put his "pee-pee" on her "pee-pee". Following this police investigation, LaBrake left Wyoming for several years. He returned to Wyoming in 1993. Four years later, in 1997, LaBrake's daughter (who was now fourteen years old) began spending weekends at his house. In 1998, the Wyoming police received information that LaBrake had taken suggestive photographs of his daughter while she was wearing lingerie. The police searched LaBrake's bedroom and seized a Polaroid camera and seventeen photographs.

In August 1999, after the Alaska State Troopers received the report that LaBrake had sexually abused J.M. at the mining claim, Trooper Susan Acquistapace interviewed LaBrake about the Wyoming allegations (as well as the Alaska allegations). According to Acquistapace's account of that interview, LaBrake admitted that he had fondled his daughter when she was a toddler, and that he had purchased lingerie for her when she was a teenager and had taken photographs of her wearing the lingerie. In other words, LaBrake apparently admitted that he engaged in conduct which, if performed in Alaska, would have constituted second-degree sexual abuse of a minor under AS 11.41.436(a)(3) and, potentially, exploitation of a minor under AS 11.41.455(a).

LaBrake's defense attorney, Robert Noreen, did not file an opposition to these two proposed aggravating factors.

(As indicated above, the presence or absence of these aggravators did not alter the superior court's sentencing authority in LaBrake's case. Even in the absence of aggravating factors, AS 12.55.125(k)(2) allowed the court to sentence LaBrake to any term of imprisonment up to the 10–year maximum for a class B felony, so long as the "time to serve" component of this sentence did not exceed 4 years. Ordinarily, the State's proof of aggravators would have authorized the superior court to impose more than 4 years to serve, but LaBrake's plea bargain capped the "time to serve" component of his sentence at 4 years.)

Superior Court Judge Niesje J. Steinkruger ultimately found both aggravators to be proved. Nevertheless, Judge Steinkruger adhered to the plea bargain and sentenced LaBrake to 5 years with 1 ½ years suspended—i.e., 3 ½ years to serve.

Following his sentencing, LaBrake obtained a new attorney, Thomas E. Fenton. Mr. Fenton filed a sentence appeal on LaBrake's behalf, arguing that LaBrake's sentence was excessive and also that the superior court should not have ordered LaBrake to undergo treatment for substance abuse as one of the conditions of his probation. However, Fenton died in July 2001, while LaBrake's appeal was still in the briefing stage. LaBrake was not notified of Fenton's death, and no other attorney was appointed to assume responsibility for the appeal. Because no brief was ever filed on LaBrake's behalf, the Clerk of the Appellate Courts dismissed the appeal for want of prosecution.

In October 2001, LaBrake heard (secondhand) that his appeal had been dismissed, and he wrote a letter to Judge Steinkruger. In December 2001, a new attorney, Marlin Smith, was assigned to represent LaBrake.

Based on a series of letters that LaBrake wrote to Smith between September 2002 and March 2003, it appears that LaBrake and Smith discussed two different possibilities: (1) seeking to have LaBrake's sentence appeal reinstated, and/or (2) filing a petition for post-conviction relief, asking that LaBrake be allowed to withdraw his plea.

In July 2003, LaBrake filed a petition for post-conviction relief in which he asked to withdraw his plea, or to be resentenced, or to be allowed to reinstate his appeal and amend his points on appeal.

In response, the State filed a motion asking the superior court to dismiss LaBrake's petition. The State argued that some of LaBrake's claims were barred and that, with respect to the remainder, LaBrake had failed to present a prima facie case for relief.

Attorney Marlin Smith filed an opposition to the State's motion. In this opposition, Smith declared that LaBrake's primary claim was ineffective assistance of counsel. Ac-

cording to Smith, LaBrake received ineffective assistance from his first attorney, Robert Noreen, in two respects: with respect to the investigation and consultation that led to LaBrake's decision to accept the State's plea bargain, and with respect to the litigation of the sentencing hearing. Smith also argued that LaBrake received ineffective assistance from his second attorney, Thomas Fenton, because, after LaBrake enlisted Fenton to file a motion asking the superior court to allow LaBrake to withdraw his plea, Fenton instead filed a sentence appeal—which was later dismissed for non-prosecution after Fenton's death.

In May 2004, Judge Steinkruger notified the parties that, after reading the State's motion to dismiss and LaBrake's response to that motion, she believed that LaBrake's petition failed to state a prima facie case for relief. Judge Steinkruger gave LaBrake twelve weeks to file an amended petition.

LaBrake ultimately filed two supplements to his petition in which he expanded some of his arguments and provided new documentation relating to his claims of ineffective assistance of counsel.

However, even after these new pleadings, Judge Steinkruger remained convinced that LaBrake had failed to present a prima facie case for post-conviction relief. In a nine-page written order, Judge Steinkruger analyzed LaBrake's claims and dismissed his petition.

LaBrake now appeals the superior court's decision.

*Did the affidavits and documents filed in support of LaBrake's petition establish a prima facie case that he received ineffective assistance of counsel from his first attorney, Robert Noreen?*

LaBrake claims that his petition for post-conviction relief presented a prima facie case that he received ineffective assistance of counsel from Robert Noreen, the attorney who represented LaBrake following his indictment, who advised LaBrake to accept the State's plea bargain, and who litigated LaBrake's case at sentencing.

*(a) LaBrake's assertions that Noreen failed to represent him competently during the time leading up to LaBrake's acceptance of the plea bargain*

In his petition, LaBrake claimed that Noreen did not adequately discuss the case with him and that Noreen failed to share with him the information in the State's pre-trial disclosures. Thus, according to LaBrake, he could not intelligently decide whether to accept or reject the State's proposed plea bargain. In fact, LaBrake claimed that his change of plea was "coerced by counsel".

In support of these claims, LaBrake filed an affidavit in which he asserted that Noreen had one "short meeting" with him about the case before he decided to accept the State's proposed plea agreement. During this meeting, according to LaBrake, Noreen "told [him] that it was ... Noreen's belief that [LaBrake] would lose at trial", and he "convinced [LaBrake] to plead no contest to one [count] in return for dismissal of the second [count]".

In his affidavit, LaBrake stated that he believed that Noreen made no investigation of the facts of the case. In particular, LaBrake stated that he informed Noreen that he (LaBrake) had a videotape displaying the physical layout of the camper where the offense was alleged to have occurred, and that this videotape showed that the offense could not have occurred as J.M. and her sister described it.

LaBrake further stated that Noreen "failed to provide [him] with the opportunity to meaningfully review the Grand Jury proceedings", and that Noreen "sought no information from [LaBrake] ... to determine what defenses were available". Instead, LaBrake declared, "Noreen bluntly told [him] that he [i.e., Noreen] thought that [LaBrake] was lying".

Noreen filed an affidavit in which he disputed many of LaBrake's assertions. With regard to LaBrake's claims that Noreen had not worked much on the case, and that he had met with LaBrake only once or twice, Noreen asserted that he had numerous conferences with LaBrake and with members of LaBrake's family, and that he had sent sev-

eral letters to LaBrake. Noreen added that his conferences with LaBrake "were longer than with most clients".

With regard to LaBrake's claim that Noreen had not supplied him with information about the case, Noreen stated that he supplied LaBrake with the State's pre-trial disclosure (including grand jury), and that he discussed these materials with LaBrake.

With respect to LaBrake's assertions that Noreen had failed to investigate potential defenses, and in particular the purportedly exculpatory videotape, Noreen answered that the "crucial facts [of LaBrake's offense] were uncontested"—and that the State's evidence "included a handwritten letter of apology and endearment from Mr. LaBrake to the child". Noreen added that, during his investigation of the case, he received "considerable, although not defense-helpful[,] input from several of Mr. LaBrake's family members".

Noreen stated that when he told LaBrake that, in his opinion, LaBrake would lose if he went to trial, LaBrake was unwilling to hear this—that LaBrake "unrealistically minimized or rationalized every aspect of his involvement [in the offense], blaming the [victim's] mother [and his] neighbors in the mining area."

Noreen further declared that he discussed the State's proposed plea agreement with LaBrake—and that, after LaBrake decided to accept the plea agreement, he provided LaBrake with the State's pre-sentence memorandum and discussed this memorandum with LaBrake.

■ When, as in LaBrake's case, a defendant claims that their attorney gave them incompetent advice or made incompetent decisions, the defendant must show one of two things: either (1) that the attorney's choice of strategy or tactics was so bad that no competent criminal law practitioner would have handled these issues the same way;[3] or (2) that the attorney's investigation and preparation of the case was so inadequate that the attorney had no competent basis for making decisions (with regard to the matters entrusted to the attorney's decision) or for rendering advice regarding the matters entrusted to the defendant's decision.[4]

Moreover, because the State asked the superior court to dismiss LaBrake's petition based on the pleadings alone (i.e., without pre-trial discovery, and without a trial), the superior court was obliged to treat all of the well-pleaded assertions of fact in LaBrake's petition as true, and then decide whether these assertions of fact (if ultimately proved) would entitle LaBrake to post-conviction relief.[5]

Thus, even though Noreen (in his affidavit) controverted many of LaBrake's assertions of fact, this is irrelevant to the superior court's decision of the State's motion for judgement on the pleadings. In deciding this motion, the superior court was obliged to presume that LaBrake's well-pleaded assertions of fact were true, notwithstanding Noreen's competing affidavit.

For example, LaBrake asserted (in his affidavit) that Noreen spoke with him only once before LaBrake decided to accept the State's plea bargain, and that Noreen "sought no information from [LaBrake]" concerning potential defenses to the State's alle-

---

3. See *Risher v. State*, 523 P.2d 421, 424 (Alaska 1974) (holding that the test for ineffective assistance of counsel in criminal cases is whether the attorney's conduct fell below the minimal range of competence required of an attorney who has "ordinary training and skill in the criminal law").

4. See *State v. Jones*, 759 P.2d 558, 570–71 (Alaska App.1988) (recognizing that an attorney's investigation of a case may be so incompetent as to exclude the possibility that the attorney's decisions were the fruit of sound tactical choice).

5. *J & L Diversified Enterprises, Inc. v. Anchorage*, 736 P.2d 349, 351 (Alaska 1987) (an appellate

court reviewing a dismissal on the pleadings must accept as true all well-pleaded allegations of fact contained in the appellant's trial court pleadings); *Steffensen v. State*, 837 P.2d 1123, 1125–26 (Alaska App.1992) ("[W]hen the superior court decides whether the defendant's petition states a prima facie case for relief, the superior court is obliged to view the factual allegations of the defendant's petition in the light most favorable to the defendant."); *Jones*, 759 P.2d at 565 (the superior court's ruling on a motion for judgement on the pleadings under Criminal Rule 35.1(f) is equivalent to a ruling on a motion under Civil Rule 12(c) for judgement on the pleadings).

gations. Noreen responded (in his affidavit) that he spoke with LaBrake several times during this period and that they discussed LaBrake's view of the charges—but that the "crucial facts [of LaBrake's offense] were uncontested" and that LaBrake "unrealistically minimized or rationalized every aspect of his involvement [in the offense]". Although the record contains these competing versions of the underlying facts, the superior court was obliged to presume that LaBrake's statements were true.

However, this presumption does not apply to LaBrake's statements concerning the law, or concerning mixed questions of law and fact (e.g., his assertions concerning the legal effect or categorization of the underlying occurrences), nor does the presumption apply to LaBrake's conclusory assertions concerning the ultimate facts to be decided.

As explained in Wright and Miller's *Federal Practice and Procedure,* a court deciding a motion for judgement on the pleadings need not assume the truth of the non-moving party's conclusions of law, nor the truth of the non-moving party's assertions concerning facts that are legally impossible, or the party's assertions concerning matters that would not be admissible in evidence. Moreover, the court need not assume the truth of assertions that are patently false or unfounded, based on the existing record or based on the court's own judicial notice.[6] In addition, a court need not assume the truth of *pro forma* assertions of the ultimate facts to be proved when these assertions are not supported by specific details.[7]

Thus, for example, LaBrake asserted in his affidavit that Noreen coerced him into accepting the State's proposed plea bargain. The superior court was not obliged to presume the truth of this conclusory assertion about the legal effect of Noreen's conduct on LaBrake's state of mind.[8]

Likewise, the superior court was not obliged to presume the truth of LaBrake's conclusory assertion that Noreen failed to investigate the case. LaBrake did not claim to have first-hand knowledge that this was true; rather, this was LaBrake's conclusion or suspicion based on what he observed. The superior court did not have to treat this conclusion as true—although the court *did* have to assume the truth of LaBrake's assertions concerning the events within his knowledge that led him to reach this conclusion.

Returning, then, to the assertions in LaBrake's affidavit, Judge Steinkruger was obliged to assume that Noreen met with LaBrake only once before LaBrake decided to accept the State's plea bargain. But this, in itself, does not establish a prima facie case that Noreen's advice to LaBrake (that LaBrake was likely to lose if he went to trial, and that LaBrake should accept the plea agreement) was incompetent or was based on an inadequate investigation of the case.

LaBrake further asserted that Noreen failed to give him a "meaningful" opportunity to review the grand jury record before asking him to make a decision regarding the proposed plea bargain. But this assertion is problematic; LaBrake appears to be conceding that he had some opportunity to review the grand jury record, although he now believes that this opportunity was not "meaningful". Judge Steinkruger was not obliged to accept LaBrake's conclusory characterization of the facts.

Moreover (and more important), LaBrake failed to assert how or why a closer examination of the grand jury record would have revealed a substantial flaw in Noreen's evaluation of the case or would have altered a competent attorney's advice as to whether LaBrake should accept or reject the State's offer.[9]

6. Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* (3rd edition, 2004), § 1368, Vol. 5C, pp. 243–45.

7. *Id.,* § 1368, Vol. 5C, p. 255.

8. *See Kohen v. H.S. Crocker Co.,* 260 F.2d 790, 792 (5th Cir.1958) (rejecting the argument that the court was obliged to presume the truth of the

non-moving party's claims that the other party's actions constituted "compulsion", "coercion", or "duress").

9. *See Steffensen v. State,* 837 P.2d 1123, 1127 (Alaska App.1992) ("Steffensen ... faults his attorney for failing to review the grand jury record.... However, Steffensen does not indicate how such a review ... would have yielded pertinent information.").

LaBrake asserted that Noreen "sought no information from [him]" concerning potential defenses to the charges. This assertion is potentially at odds with LaBrake's further assertion that "Noreen bluntly told [him] that he thought [LaBrake] was lying" about the offense. It seems unlikely that Noreen would tell LaBrake that he thought LaBrake was lying unless the two men were discussing LaBrake's version of events.

But even assuming the truth of LaBrake's assertion that Noreen never asked him about potential defenses, LaBrake's petition failed to offer any potential defenses that a competent attorney in Noreen's position would have pursued.

It is true that, according to LaBrake's affidavit, he told Noreen that he had a videotape of his camper which purportedly showed that the girls' description of the inside of the camper was not accurate. But LaBrake's affidavit fails to describe how this purported inaccuracy in the girls' description would have created a viable defense to the charges against LaBrake, or would have caused a competent attorney in Noreen's position to recommend that LaBrake reject the State's proposed plea agreement. LaBrake's pleadings do not rebut or controvert Noreen's assertion that the "crucial facts [of LaBrake's offense] were uncontested".

LaBrake also asserted that Noreen never explained that LaBrake would be subject to the requirements of Alaska's sex offender registration law. But according to the State's motion to dismiss LaBrake's petition, the requirement of sex offender registration was explained to LaBrake when he came to court to enter his plea, and the court gave LaBrake a copy of the notice informing him that he was obliged to register. LaBrake never asserted, either at the time he entered his plea or in his later petition for postconviction relief, that he would not have accepted the State's proposed plea agreement if he had known about this requirement.

Turning to LaBrake's other assertions about the competency of Noreen's representation during the period leading up to LaBrake's acceptance of the plea bargain, LaBrake asserted in his affidavit that Noreen was personally prejudiced against him. LaBrake based this assertion on the fact that Noreen had told him that he (Noreen) had a teenage daughter, and that he was personally strongly opposed to the sexual abuse of children.

As explained above, the superior court was not obliged to assume the truth of LaBrake's conclusion that Noreen was prejudiced against him. Nevertheless, the court was obliged to assume the truth of LaBrake's assertions about what Noreen had said to him. The question, then, is whether the fact that Noreen had a teenage daughter, and the fact that he felt strongly about the sexual abuse of children, was sufficient to establish a prima facie case that Noreen had a conflict of interest which prevented him from competently representing LaBrake.

The answer is "no". Lawyers are trained and expected to represent people whose conduct may be questionable, and whose views on social and moral matters may differ significantly from the lawyer's.

Alaska Professional Conduct Rule 1.2(b) states that "[a] lawyer's representation of a client ... does not constitute an endorsement of the client's ... social or moral views or activities." The accompanying Comment clarifies the philosophy behind this rule:

> Legal representation should not be denied to a person whose cause is controversial or the subject of popular disapproval. By the same token, [a lawyer's act of] representing a client does not constitute approval of the client's views or activities.

Comment, Alaska Professional Conduct Rule 1.2, ¶ 4 ("Independence from Client's Views or Activities").

In our prior decisions, we have clarified that personal difficulties or animosity between a defense attorney and a defendant does not constitute a reason for removing the attorney from the case unless "the attorney-client relationship has deteriorated to the point where the attorney is incapable of effective communication with the defendant or [the attorney is incapable of] objective deci-

sion-making about the case".[10] Thus, although Noreen may have had strong personal feelings about the sexual abuse of children, and although Noreen may have believed that LaBrake was guilty of such a crime, this in itself would not constitute a prima facie reason for concluding that Noreen failed to represent LaBrake competently and diligently.

LaBrake's affidavit contained one other assertion bearing on Noreen's potentially conflicting interests. LaBrake asserted that Noreen mentioned that he was representing J.M. in unrelated litigation, and that even though Noreen assured LaBrake that this "shouldn't present any conflict", Noreen never actually asked LaBrake whether he wished to object to this potentially conflicting representation.

Although this issue was initially litigated in connection with the State's motion for judgement on the pleadings, Judge Steinkruger's decision on this issue actually represented a grant of summary judgement—because the litigation of this point went forward to pretrial discovery.

After LaBrake filed an affidavit asserting that Noreen had told him that he was representing J.M. in an unrelated case, Noreen filed a responding affidavit in which he declared that this was not true—that he had not represented J.M. in any child-in-need-of-aid case.

After Noreen filed his affidavit, LaBrake's attorney filed a motion asking Judge Steinkruger to examine, in camera, the records of certain juvenile proceedings. LaBrake's attorney acknowledged that Noreen might not have represented J.M. in a child-in-need-of-aid case, but LaBrake's attorney asserted that J.M. had been "both a perpetrator and a witness" in a vehicle theft case that was litigated in juvenile court around the time that Noreen was appointed to represent LaBrake. LaBrake's attorney asked Judge Steinkruger to examine the court's confidential records to find out which lawyer was appointed to represent J.M.

After the State announced that it had no objection to Judge Steinkruger's examining the pertinent files, Judge Steinkruger conducted the requested in camera review and then issued an order describing her findings. The judge listed seven different children's proceedings files and told the parties that she had obtained (and examined) copies of each of them. Judge Steinkruger then listed all of the attorneys who had been appointed to represent either a child or a parent in those seven legal proceedings. Noreen was not among these attorneys. Judge Steinkruger told the parties that she had also examined these seven files for attorneys who appeared as guardians ad litem by appointment through the Office of Public Advocacy. Again, Noreen was not among those attorneys.

Judge Steinkruger concluded her order by stating: "If [either] party, through counsel, wishes to review these [copies of the] files before the court shreds them[,] they shall file a motion within ten days of the distribution date of this order." Neither party responded to the judge's offer, and neither party filed further pleadings relating to this issue.

Because of the way this issue was handled, Judge Steinkruger did not technically grant a "judgement on the pleadings" when she resolved this issue against LaBrake. Rather, this particular issue (alone among the many issues that LaBrake raised) went forward to the discovery process, and the parties apparently stopped litigating only after they concluded that the pertinent facts had been fully developed. Judge Steinkruger's ruling was therefore akin to a grant of summary judgement.

After Judge Steinkruger reviewed the court files at LaBrake's request, and after she found that, contrary to LaBrake's suspicions, Noreen had had no involvement in these legal proceedings, and after LaBrake failed to seek any further discovery from Noreen or from the court, Judge Steinkruger

---

10. *Walsh v. State*, 134 P.3d 366, 371 (Alaska App.2006), citing *Mute v. State*, 954 P.2d 1384, 1385–86 (Alaska App.1998); *Gardner v. State*, Alaska App. Memorandum Opinion and Judgment No. 5064 at 9–11 (March 29, 2006), 2006 WL 829758 at *4–6 (Mannheimer, J., concurring); Wayne R. LaFave, Jerold H. Israel, and Nancy J. King, *Criminal Procedure* (2nd ed.1999), § 11.4(b), Vol. 3, p. 554.

could properly conclude that the State was entitled to judgement on this particular claim.

For these reasons, we uphold Judge Steinkruger's dismissal of LaBrake's various claims that he received ineffective assistance of counsel from Noreen during the time leading up to LaBrake's acceptance of the State's plea bargain.

*(b) LaBrake's assertions that Noreen failed to represent him competently in preparation for, and at, his sentencing*

LaBrake also claimed that, in various ways, Noreen was incompetent in his handling of the sentencing proceedings.

■ In his affidavit, LaBrake asserted that he never saw a copy of the State's sentencing memorandum until after he was convicted and sentenced; LaBrake asserted that this memorandum was shown to him only during the preparation of his petition for post-conviction relief. Although Noreen declared (in his responding affidavit) that he had provided LaBrake with a copy of this document, Judge Steinkruger was obliged to assume the truth of LaBrake's assertion.

But even assuming that LaBrake never received a copy of this document until after he was sentenced, LaBrake failed to rebut Noreen's assertion that he discussed the *contents* of the State's pre-sentencing memorandum with LaBrake. Moreover, LaBrake's affidavit contains no assertion that earlier possession of the document might have altered the defense strategy at the sentencing hearing, or might have altered the outcome of that hearing.

Next, LaBrake asserted that "Noreen failed to explain" that if the State proved aggravating factors at the sentencing hearing, this "could substantially increase [LaBrake's] exposure to actual time incarcerated". This contention is demonstrably meritless. If Noreen failed to explain that aggravating factors might increase LaBrake's time to serve, this is because it was untrue. The plea agreement established a 4–year cap on the "time to serve" component of LaBrake's sentence—the same limitation imposed by the governing sentencing statute, former AS 12.55.125(k)(2), in the absence of aggravating factors. Thus, the State's proof of aggravating factors could not "increase [LaBrake's] exposure to actual time incarcerated".

■ LaBrake further claimed that Noreen acted without his authorization when he conceded the State's proposed aggravator (c)(5) (that LaBrake knew or should have known that J.M. was a particularly vulnerable victim). In addition, LaBrake asserted that the facts did not support this aggravator, and that even if the facts supported this aggravator, the superior court was prohibited from increasing LaBrake's sentence in reliance on this aggravator because it overlapped with the elements of the offense.[11]

The fact that Noreen conceded aggravator (c)(5) without LaBrake's express authorization would only make a difference if, as a matter of law, the concession of aggravating factors is not a tactical decision for the defense attorney to make, but is instead a decision reserved to the defendant personally.

The division of authority between an attorney and client is addressed in Alaska Professional Conduct Rule 1.2(a). As we explained in *Simeon v. State*, 90 P.3d 181 (Alaska App. 2004), this rule declares that, in a criminal case, the client has the final authority to decide what plea to enter, whether to waive jury trial, whether to testify, and whether to take an appeal. *Id.* at 184. We then concluded: "Since the rule limits the client's authority to those decisions, it follows that the lawyer has the ultimate authority to make other decisions governing trial tactics . . . ." *Id.*

Our decision in *Simeon* strongly suggests that Noreen could decide to concede aggravator (c)(5) without LaBrake's express authorization. LaBrake's petition does not address *Simeon* or provide any other legal authority on this point. Accordingly, Judge Steinkruger could properly dismiss this claim.

11.  *See* AS 12.55.155(e).

■ With regard to LaBrake's assertion that the facts did not support this aggravator, we note that it is not enough for LaBrake to assert that aggravator (c)(5) might reasonably have been disputed. LaBrake's underlying claim is incompetence of counsel. Thus, LaBrake was obliged to show that no competent attorney would have decided to concede aggravator (c)(5), given the facts of the case *and* given the fact (as explained above) that, because of the plea agreement, proof of this aggravator would not increase LaBrake's sentencing exposure.

As Noreen explained in his affidavit, LaBrake was charged with taking two young girls to his mining camp "where ... the ... children had no ability to leave", and that LaBrake then "resisted their removal when confronted by [the Cottons]".

At the sentencing hearing, when Judge Steinkruger asked Noreen if the defense was contesting aggravator (c)(5), Noreen answered "no"—although he gave a slightly different rationale for conceding this aggravator:

> *Defense Attorney:* No. My client was—[and] I'm stating this more for the record, then—my client was aware that the two [children] were inappropriately cared for by their mother.... [H]e recognizes that, because [they were in their] minority, and [given the] lack of parental supervision, it did make them vulnerable.

Judge Steinkruger then found aggravator (c)(5), based in part on the rationale explained in Noreen's post-conviction relief affidavit—*i.e.,* the fact that LaBrake's act of taking J.M. to his mining camp (where she and her sister were alone with LaBrake) made J.M. more vulnerable to being sexually abused.

Throughout this discussion, LaBrake never objected or interjected any other comment in response to the statements made by Noreen or Judge Steinkruger. However, toward the end of the hearing, when Judge Steinkruger was making her sentencing comments, she again mentioned that LaBrake had taken J.M. and her sister to his mining camp. At this point, LaBrake (speaking to the judge directly) objected. Here is the pertinent colloquy:

> *The Court:* It is of great concern [to me] that Mr. LaBrake lacks the insight that if a 36–year–old man takes two young teenage girls and keeps them at a remote site, that that is not a good situation when he knows that he had ...

> *LaBrake:* That's not a true statement, Your Honor. I never objected to it [before] because I was just going along, because I knew I was wrong with what I did. But there's evidence that you keep referring to, and that [the prosecutor] keeps referring to, that's not true. I've let it go [up until now] because I did do wrong. But I did not hold [the girls] by force [at the mining camp]....

> [There] were two camps sitting right next to each other, not two miles away from each other. It's physical [fact]; anybody can go up and look at it....

> *The Court:* So you're saying [that] it was up to [the girls] to leave?

> *LaBrake:* The Cottons [*i.e.,* the family friends at the nearby mining camp] did not want those girls; they called them white trash. I'm in the middle of a family feud. As well as me doing wrong, there's a family feud going on. Those two families do not like each other; they hate each other's guts. And, now, it's gotten all twisted around ... and I'm caught in the middle of it.... There's a lot of lies ... that I've let go. But I did not take [the girls] and force them to be right there. I did not do that.

> *The Court:* There may not have been physical force, but the Court finds that Mr. LaBrake exerted his authority [over the girls].

Given this record, and given the fact that proof of aggravator (c)(5) would not affect Judge Steinkruger's sentencing authority, LaBrake failed to present a prima facie case that no competent attorney in Noreen's position would have conceded aggravator (c)(5).

Finally, LaBrake asserts that, even if the facts supported this aggravator, Judge Steinkruger was prohibited from increasing LaBrake's sentence in reliance on this aggravator because it overlapped with the elements of the offense. But LaBrake does not explain why he believes this.

If Judge Steinkruger had found that J.M. was particularly vulnerable based solely on the fact that J.M. was fourteen years old, LaBrake might have a colorable claim that this aggravator was implicit in the elements of his crime (engaging in sexual contact with a person between the ages of thirteen and sixteen). But, as just explained, Judge Steinkruger relied on the fact that LaBrake took J.M. to his mining camp, where she was isolated from the help of other adults. This circumstance does not overlap with the elements of LaBrake's offense. Thus, Noreen was not incompetent when he failed to argue that the law prohibited the State from proposing this aggravator.

■ LaBrake also asserted that, at the sentencing hearing, Noreen acted incompetently by failing to oppose the State's hearsay evidence supporting aggravator (c)(18)(B)—*i.e.,* the allegation that LaBrake had previously engaged in improper sexual conduct with his own daughter in Wyoming.

According to LaBrake's affidavit, LaBrake "kept trying to tell [Noreen that this alleged sexual abuse] didn't happen"—that he had a "perfect" alibi because he "was on distant military maneuvers at the time". And, with respect to the allegation that LaBrake had taken sexually suggestive photographs of his daughter, LaBrake asserted that this allegation was false. According to LaBrake, there was "apparently a misunderstanding about some photos taken by [his daughter's] boyfriend and photos of [his] daughter taken by [himself]."

In his responding affidavit, Noreen stated that LaBrake never informed him of the purported "perfect alibi" defense to the sexual abuse allegation. Instead, Noreen declared, "[t]here was no evidence to contradict [this] aggravator". Noreen conceded that the State of Wyoming failed to pursue criminal charges against LaBrake, but Noreen asserted that this was because LaBrake "[left] the jurisdiction after being confronted

with substantial allegations [of criminal conduct]."

Noreen's account—in particular, his assertion that he made a tactical decision not to contest aggravator (c)(18)(B), and a tactical decision not to require the State to present live testimony in support of this aggravator—is corroborated by the record of LaBrake's sentencing hearing.

Toward the beginning of that hearing, when Judge Steinkruger asked Noreen if LaBrake was contesting the State's proposed aggravators, Noreen responded "There is some factual data that we disagree with[:] ... minor issues that my client has brought out regarding ... the allegation that ... he encouraged [his daughter] to have sex with ... her boyfriend."

Judge Steinkruger pointed out that LaBrake had never offered a testimonial denial of aggravator (c)(18)(B)—and that, as a result, the State was not prepared to present live witnesses regarding these allegations.[12] The judge then asked Noreen if LaBrake was now willing to offer the required testimonial denial:

> *The Court:* Here's the choice: [Either] I will rely on what's in the pre-sentence report in determining the sentence [or, if] there are [disputed] issues in [that report] which you think bear upon the sentence, ... I will allow you to [offer] a late testimonial denial and [then] grant ... the State a continuance in order to [prepare live testimony to] meet that [testimonial denial], if that's how you wish to proceed.
>
> *Defense Attorney:* I don't [wish to proceed in that manner], because ... there's evidence involving [LaBrake's] most recent involvement with his daughter, [evidence] that he is in accord with, that justif[ies] [the aggravator] being considered.
>
> *The Court:* All right.

Later in the hearing, when Judge Steinkruger asked Noreen to state the defense position on aggravator (c)(18)(B), Noreen told the judge:

> the matters asserted unless the defendant offers a testimonial denial of those matters and submits to cross-examination, in which case the State must support its assertions with live testimony).

**12.** *See Evans v. State,* 23 P.3d 650, 652 (Alaska App.2001); *Hamilton v. State,* 771 P.2d 1358, 1362–63 (Alaska App.1989) (holding that a sentencing judge can rely on out-of-court statements described in the pre-sentence report for proof of

*Defense Attorney:* Here's the factual basis that [my client] does not dispute: ... he was under investigation [in Wyoming] and [he] understands that he had some type of parental control over his teenage, but underage, daughter ... in a context where he took photographs of her in lingerie. And that is an inappropriate [thing] for a father to do.

LaBrake made no comment in response to any of Noreen's statements on this issue. Judge Steinkruger then found that aggravator (c)(18)(B) was proved.

In his post-conviction affidavit, Noreen acknowledged that LaBrake wanted him to force LaBrake's daughter to take the stand at the sentencing hearing with regard to the State's allegations of sexual impropriety— apparently by having LaBrake enter a testimonial denial of the allegations, which would then prevent the State from relying on hearsay to support the allegations. Noreen concluded, however, that this course of action "would work to Mr. LaBrake's detriment", and that "[it] lacked merit".

(As explained above, the record shows that the Wyoming police searched LaBrake's house and found photographs of LaBrake's daughter wearing lingerie. And, after LaBrake came to the attention of the Alaska authorities, the state troopers interviewed LaBrake about the Wyoming allegations. According to the trooper account of that interview, LaBrake admitted that he had fondled his daughter when she was a toddler, and that he had purchased lingerie for her when she was a teenager and had taken photographs of her wearing the lingerie.)

On the disputed factual issue of whether LaBrake told Noreen about his asserted alibi defense to the allegations of sexual misconduct in Wyoming, Judge Steinkruger was obliged to accept LaBrake's statement as true. However, the question is whether a competent attorney, after hearing LaBrake assert this alibi, and after hearing LaBrake assert that the photographs were a "misunderstanding", could still reasonably conclude that it would be better not to have LaBrake take the stand to contest aggravator (c)(18)(B).

LaBrake's assertion that he had not engaged in sexual misconduct with his daughter (either by sexual contact or by taking sexually suggestive photographs) was contradicted by LaBrake's own statements to the Alaska State Troopers, and it was also apparently contradicted by physical evidence in the possession of the Wyoming police. Moreover, as explained above, the proof of this aggravating factor would not affect LaBrake's sentencing exposure.

We conclude that even if LaBrake was willing to take the stand to controvert these allegations, a competent attorney could nevertheless decide that it would be better to concede aggravator (c)(18)(B) rather than have LaBrake enter a testimonial denial of this aggravator. Thus, LaBrake's petition failed to present a prima facie case that Noreen represented him incompetently at sentencing with regard to this issue.

### (c) Summary and conclusion with regard to LaBrake's assertions that Noreen failed to represent him competently

We have now examined all of LaBrake's claims against Noreen. With regard to LaBrake's claim that Noreen labored under a conflict of interest because he allegedly represented J.M. in another legal proceeding, we conclude that Judge Steinkruger properly granted summary judgement to the State after further investigation of this claim demonstrated that it had no substance. And with respect to all of LaBrake's other claims against Noreen, we agree with Judge Steinkruger that LaBrake's petition and supporting documentation failed to present a prima facie case of attorney incompetence.

Accordingly, we uphold Judge Steinkruger's dismissal of LaBrake's claims against Noreen. We now turn to LaBrake's claims that he received ineffective assistance of counsel from his next attorney, Thomas Fenton.

*Did the affidavits and documents filed in support of LaBrake's petition establish a prima facie case that he received ineffective assistance of counsel from his second attorney, Thomas Fenton?*

As explained above, LaBrake claimed in his petition that he asked Thomas Fenton to

file a motion asking the superior court to allow LaBrake to withdraw his plea, but that Fenton filed a sentence appeal instead. In LaBrake's supporting affidavit, he describes the episode this way: "I told Mr. Fenton that I wanted to move to withdraw my plea[, and I explained] why, [but] Mr. Fenton talked me out of seeking to withdraw the plea and convinced me to file [a sentence] appeal instead."

In his petition, LaBrake asserted that Fenton acted incompetently by talking him out of filing a motion to withdraw his plea, and filing a sentence appeal instead. LaBrake's memorandum in support of his petition states: "Without ineffective assistance of counsel by Mr. Fenton, Mr. LaBrake could have had a motion to withdraw [his plea] filed and pursued rather than having to now pursue post conviction relief."

But, as explained above, the superior court was not obliged to accept this conclusory assertion as true. And LaBrake provided no facts to support this assertion of attorney incompetence. In fact, the record suggests the opposite.

The record contains a letter that Fenton wrote to LaBrake on June 8, 2000. In this letter, Fenton informed LaBrake that he had received LaBrake's court file and that he was reviewing the file for potential appeal points. Fenton also told LaBrake:

> Normally[,] when a person enters a plea of no contest or guilty, there are no points to appeal except in unusual circumstances. As I understand it, you want to appeal your sentence as being excessive. I also understand that you want to appeal the probation condition that requires you to complete a substance abuse evaluation. Are there any other points in your mind? Please let me know.

Two months later, Fenton wrote a follow-up letter to LaBrake:

> This is in reference to your telephone message of August 4, 2000.
>
> We can use as a point on appeal the fact that you objected to the use of the Wyoming crime [i.e., LaBrake's alleged improprieties with his daughter] in your sentenc-

ing. I have ordered a copy of the hearing and[,] if the objection appears [in the record], we can ask the [appellate] court to amend the points on appeal[,] and the court normally grants [such a request].

Neither of these letters, nor any other portion of the record, supports LaBrake's assertion that he asked Fenton to file a motion for plea withdrawal, or that Fenton advised LaBrake against that course. Moreover, even assuming that LaBrake asked Fenton to draft and file a motion to withdraw his plea, and that Fenton did indeed advise LaBrake not to pursue such a motion, LaBrake failed to present a prima facie case that this advice was incompetent. As Judge Steinkruger noted in her decision, LaBrake failed to present a prima facie case that he could establish the manifest injustice required for a post-sentencing plea withdrawal.[13]

■ In any event, LaBrake does not advance this claim in his brief to this Court. Rather, LaBrake presents a different claim on appeal: that Fenton acted incompetently by failing to either file LaBrake's sentence appeal brief or, knowing that he was seriously ill, make arrangements to have another attorney assume responsibility for LaBrake's sentence appeal.

The material facts underlying this claim are not in dispute: Fenton was seriously ill, and near death, in the summer of 2001. He did not file LaBrake's sentence appeal brief, nor did he arrange for another attorney to assume responsibility for LaBrake's appeal—and, as a consequence, the appeal was dismissed for non-prosecution.

It is true, as we described earlier, that when Judge Steinkruger found out what had happened, she set about finding a new attorney for LaBrake who would move to reinstate the appeal. For reasons that are not explained in the record, LaBrake's new attorney—Marlin Smith—did not pursue the simple expedient of asking this Court to reinstate the appeal. Rather, Smith inserted this issue into LaBrake's petition for post-conviction relief.

---

13. *See* Alaska Criminal Rule 11(h)(3).

Smith may have chosen to handle the matter this way because he perceived that the sentence appeal issue would be moot if LaBrake succeeded in his efforts to withdraw his plea. In any event, LaBrake's petition for post-conviction relief clearly presented a prima facie case for reinstating his sentence appeal. Accordingly, we reverse the superior court's dismissal of this claim.

*Conclusion*

We uphold the superior court's decision in all respects but one: LaBrake presented a prima facie case that he should be allowed to reinstitute his sentence appeal. With respect to that claim, the judgement of the superior court is REVERSED, and LaBrake's case is remanded to the superior court for further proceedings on that claim. In all other respects, the judgement of the superior court is AFFIRMED.