NOTICE

*The text of this opinion can be corrected before the opinion is published in the* *Pacific* *Reporter*. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

CLIFFORD F. MURRAY,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-11191
Trial Court No. 2NO-09-321 CI

O P I N I O N

No. 2445 —March 20, 2015

Appeal from the Superior Court, Second Judicial District, Nome, Ben Esch, Judge.

Appearances: Dan S. Bair, Assistant Public Advocate, Appeals and Statewide Defense Section, and Richard Allen, Public Advocate, Anchorage, for the Appellant. Mary A. Gilson, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Hanley, District Court Judge.[*]

Judge MANNHEIMER.

_____

[*] Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

The defendant in this case, Clifford F. Murray, was indicted on two counts of first-degree sexual assault. He ultimately agreed to plead guilty to one count of the lesser offense of second-degree sexual assault. But now Murray seeks post-conviction relief, contending that his decision to enter this plea was contrary to his best interests. More particularly, Murray contends that his decision was the product of mental illness, and that his attorney acted ineffectively — that is, in violation of her ethical duty under Alaska Professional Conduct Rule 1.14 — by failing to prevent him (or at least trying to prevent him) from entering this guilty plea.

For the reasons explained here, we conclude that Murray has failed to set out a prima facie case that his attorney acted incompetently.

*The events leading up to Murray's guilty plea and sentencing*

Because the question to be decided on appeal is whether Murray set forth a prima facie case of ineffective assistance of counsel, the following is a description of all the well-pleaded facts contained in his petition for post-conviction relief.

In early 2007, Clifford Murray was charged with two counts of first-degree sexual assault in connection with the rape of an elderly woman in the village of Elim. Because Murray had two prior felony convictions (for non-sexual offenses), he faced a presumptive sentencing range of 40 to 60 years' imprisonment for these sexual assault counts. [1]

---

[1] AS 12.55.125(i)(1)(E).

In addition, Murray was on felony parole at the time he committed these assaults, so aggravating factor AS 12.55.155(c)(20) applied to his case. This meant that Murray faced a maximum sentence of 99 years' imprisonment. [2]

The State offered Murray two favorable plea bargains. Murray, who has an extensive history of mental illness and aberrant behavior, rejected both of these offers.

The State initially offered a plea bargain that called for Murray to receive a sentence of 20 years to serve. This sentence — fifty percent of the low end of the applicable presumptive range — was the absolute minimum term of imprisonment that the superior court could impose under AS 12.55.155(a)(2), assuming one or more mitigating factors were proved.

Murray's attorney advised him to accept the State's offer, but Murray refused. He insisted on going to trial, despite the considerable evidence against him, and he told his attorney that he did not care if he ended up serving 99 years in prison. According to the attorney's later affidavit, she "[did] everything within her power to dissuade [Murray] from this decision", but Murray was adamant.

Then, in December 2008, Murray told his attorney that he wanted to plead guilty to both counts of first-degree sexual assault, without the benefit of any plea bargain. Murray insisted that he wanted to change his plea immediately and go "straight to sentencing".

In response, Murray's attorney hurriedly negotiated a second plea bargain with the State. Under the terms of this second bargain, the State offered to let Murray plead guilty to the class C felony of attempted second-degree sexual assault (*i.e.*, attempted non-consensual sexual contact), with sentencing left "open" — *i.e.*, with

---

[2]    *See* AS 12.55.125(i) (providing a 99-year maximum term of imprisonment for all felony forms of sexual assault) and AS 12.55.155(a) (providing that when one or more aggravating factors are proved, a sentencing judge may impose any term of imprisonment up to the statutory maximum).

Murray's sentence to be determined by the court, without any constraints on the sentencing judge's decision. [3] Because of his two prior felony convictions, Murray would face a presumptive sentencing range of 15 to 25 years if he was convicted of attempted second-degree sexual assault [4] (and, because of the aggravating factor, a maximum of 99 years).

But when Murray's attorney explained this new plea bargain, Murray became angry with her and refused to accept the bargain. He then demanded to go to trial.

Then, the next day, Murray changed his mind again. He directed his attorney to propose a new plea bargain to the State — one that was less advantageous to him than the offer he had just rejected. Under Murray's proposal, he would plead guilty to second-degree sexual assault (not just the attempted crime), again with open sentencing, upon the condition that his sentencing would take place immediately.

Although pleading guilty to second-degree sexual assault was obviously not as advantageous to Murray as pleading guilty to *attempted* second-degree sexual assault, Murray's proposal did reduce the applicable presumptive sentencing range to 20 to 35 years' imprisonment — down from the 40- to 60-year range he would have faced if he was convicted of first-degree sexual assault. [5]

Although Murray's attorney thought that Murray was acting against his own best interest, the attorney promptly contacted the superior court and scheduled a change-of-plea hearing. At this hearing, Murray's attorney informed the court that Murray was entering this guilty plea against her advice, but the court ultimately accepted

---

[3] *See* AS 11.41.420(b) (second-degree sexual assault is a class B felony) and AS 11.31.100(d)(4) (an attempt to commit a class B felony is a class C felony).

[4] AS 12.55.125(i)(4)(D).

[5] AS 12.55.125(i)(3)(D).

Murray's plea to second-degree sexual assault. The court imposed a sentence of 38 years' imprisonment with 3 years suspended — *i.e.*, 35 years to serve.

*The post-conviction relief litigation*

In November 2009, Murray initiated post-conviction relief proceedings. In his petition for post-conviction relief (as ultimately amended), Murray asserted that his assistant public defender had represented him incompetently.

More specifically, Murray claimed that his attorney should have known that he was "irrational and impulsive", that he was "prone to making self-destructive decisions", and that his decision to plead guilty to second-degree sexual assault was likely "the product of his mental illness", and "neither knowing nor voluntary". Thus, Murray concluded, his attorney was ethically required to prevent Murray from pleading guilty to the reduced charge of second-degree sexual assault, or at least to warn the superior court that Murray was probably incompetent to enter this plea.

Murray's trial attorney, Assistant Public Defender Michele Murphy, filed an affidavit responding to Murray's claims. She acknowledged that she knew Murray suffered from mental illness and that his behavior was at times erratic. For this reason, Murphy secured the services of a mental health professional "to counsel Mr. Murray on a regular basis during the time leading up to his ... decision to [plead guilty]." Murphy declared that "at no time" did this mental health professional indicate that Murray was mentally incompetent.

According to the attorney's affidavit, when Murray told her that he had decided to plead guilty and that he wished to demand an immediate sentencing hearing, the attorney "adamantly opposed Mr. Murray's decision". But after seeing that she could

not dissuade him, the attorney concluded that she should fulfill her role "as an advocate for [his] wishes".

Based on the foregoing record, the State filed a motion asking the superior court to dismiss Murray's petition for post-conviction relief for failing to state a prima facie case for relief.

The State acknowledged that Murray had presented a sufficient case that he was mentally ill, but the State argued that the real issue was whether Murray was so ill that he lacked the mental competence to enter a guilty plea. On the question of Murray's competence to enter a plea, the State asserted that Murray had failed to present specific details showing that he lacked a basic understanding of his choices, or that he lacked the mental capacity to evaluate those choices. Instead, Murray had presented only conclusory assertions — assertions that the court could lawfully disregard when assessing whether Murray had set forth a litigable claim for relief. *See LaBrake v. State*, 152 P.3d 474, 481 (Alaska App. 2007).

In his opposition to the State's motion to dismiss, Murray's post-conviction relief attorney, David Allen, backed away from the earlier suggestions that Murray was not competent to change his plea. Allen now told the court that the issue was *not* whether Murray was competent or incompetent to enter his plea. Rather, Allen argued, the question was whether Murray was so noticeably impaired that his former attorney (Murphy) was ethically required to take "protective action" under Alaska Professional Conduct Rule 1.14 to prevent Murray from "compromising his own ... rights".

Allen pointed out that Murray's petition set forth a prima facie case that Murphy "knew ... that her client was impaired in his decision-making". Thus, Allen argued, even though Murray may not have been "formally incompetent" to assist in his own defense or to enter a guilty plea, Murray's mental difficulties were so obvious that Murphy violated Rule 1.14 by "surrender[ing] her critical judgment and her legal

responsibility [toward her client]", and by "simply [throwing] up her hands" when she was "unable to deal effectively with a difficult client."  Allen argued that, at the very least, Murphy should have asked the superior court to delay the change-of-plea hearing so that Murray could have a "cooling-off period".

Allen then cited several death-penalty cases where defendants refused to appeal their death sentence, or tried to have their habeas corpus petitions dismissed, and the courts found that the defendants' lawyers had a duty to disobey their clients' wishes (to ensure that the validity of the death sentences would be fully litigated).  Relying on these court decisions, Allen argued that Murray's case presented an analogous situation — because, by pleading guilty, Murray surrendered his most important procedural rights against his attorney's advice.

The superior court rejected these arguments and granted the State's motion to dismiss Murray's petition for post-conviction relief.

The superior court noted that Murray (through his attorney, Allen) was not claiming that he had been incompetent to enter the guilty plea — only that he was impaired, and that Murphy (knowing of this impairment) had been under an ethical duty to prevent him from entering his guilty plea.  And the superior court rejected Murray's contention that, under these circumstances, his attorney was ethically required to act contrary to his wishes.

The court noted that, at the change-of-plea hearing, Murphy informed the court that Murray was acting contrary to her advice.  But the court rejected the notion that Murphy was required to actively thwart Murray's desire to plead guilty.  The court declared that "[if] a defendant is competent to proceed, [then] he is able to make the decision to enter a plea of guilty regardless [of] whether his attorney thinks it is a good [or] bad ... choice."

With respect to Allen's argument that Murphy should have asked for a delay of the change-of-plea hearing, to give Murray a "cooling off" period, the superior court noted that Murray failed to offer any evidence that he would have reconsidered his decision if his attorney had succeeded in getting the court to delay the hearing.

*Why we uphold the superior court's ruling*

At the heart of this case is the question of how far an attorney must go in respecting the autonomy of a client, even when the attorney is convinced that the client is making bad choices — and, conversely, to what extent an attorney has a duty to take action to protect a client from himself. More technically, this case presents a question regarding the relationship between two ethical rules that govern the legal profession.

The first of these rules, Alaska Professional Conduct Rule 1.2(a), directs defense attorneys to abide by their clients' decisions "as to [the] plea to be entered", and "whether to offer or accept a [plea bargain]".

But the Comment to Rule 1.2 declares that "[when a] client appears to be suffering impaired [mental] capacity, the lawyer's duty to abide by the client's decisions is to be guided by [Professional Conduct] Rule 1.14."

This second rule, Professional Conduct Rule 1.14, addresses an attorney's ethical obligations when a client's decision-making capacity is impaired by youth, or by mental deficiency, or for any other reason.

Subsection (a) of Rule 1.14 echoes the principle codified in Rule 1.2(a): even when a defendant has impaired capacity to make "adequately considered decisions" in connection with the case, the defense attorney must still, "as far as reasonably possible, maintain a normal [attorney-client] relationship with the [defendant]."

But subsection (b) of the rule authorizes the attorney to take "reasonably necessary protective action" if the attorney reasonably believes that, as a result of the defendant's impaired capacity, (1) "the [defendant] is at risk of substantial physical, financial, or other harm unless action is taken", and (2) "the [defendant] cannot adequately act in [their] own interest".

Subsection (b) then suggests two types of "protective actions" that an attorney might take when a client's decision-making capacity is substantially impaired. First, the lawyer may "consult[] with individuals or entities that have the ability to take action to protect the client" — and the lawyer is authorized to divulge client confidences and secrets for this purpose under subsection (c) of the rule. Second, "in appropriate cases," the lawyer may "seek[] the appointment of a guardian ad litem, conservator[,] or guardian [for the defendant]."

As we have explained, Murray's trial attorney responded to his mental impairment by taking action that was similar in nature to the first suggestion listed in Rule 1.14(b): she secured the services of a mental health professional to counsel Murray on a regular basis during the course of the representation.

Murray argues that this was not enough to satisfy the trial attorney's duty to him under Rule 1.14 — that the attorney should have actively impeded Murray after he announced that he wished to plead guilty to second-degree sexual assault.

Murray's argument rests on two premises: (1) that his lawyer failed to abide by a duty imposed by Rule 1.14, and (2) that Rule 1.14 establishes the standard of competent representation in these circumstances. Both of these premises are questionable.

With regard to Murray's first premise, the only *duty* imposed by Professional Conduct Rule 1.14 is the duty prescribed in subsection (a) of the rule: a

lawyer "shall" maintain a normal attorney-client relationship with the impaired client as far as reasonably possible.

By comparison, the types of protective action listed in subsection (b) of the rule are not described as mandatory. They are instead described as *permissible* responses to the problem of an impaired client: "the lawyer *may* take reasonably necessary protective action". (Emphasis added) Similarly, the fifth paragraph of the Comment to Rule 1.14 states that "paragraph (b) [of the rule] *permits* the lawyer to take protective measures deemed necessary." (Emphasis added)

This, in turn, casts doubt on Murray's second premise: that Professional Conduct Rule 1.14 was intended to establish the standard for competent representation of an impaired client. Rule 1.14 does not, on its face, prescribe a mandatory course of conduct or define a standard of competent representation. Rather, the apparent purpose of Rule 1.14 is to address an issue of professional ethics. The wording of Rule 1.14 and its accompanying Comment indicates that Rule 1.14 was mainly intended to insulate a lawyer from professional discipline when a lawyer decides to take action to protect an impaired client in circumstances where the attorney's action might arguably be viewed as antagonistic to the client's wishes or interests.

But even if we assume that Rule 1.14 at least helps to define the scope of competent representation in situations where a criminal defendant has an impaired capacity to make decisions, the record in this case indicates that Murray's trial attorney *did* comply with Rule 1.14: she recognized that Murray was mentally ill, and she retained a mental health professional to counsel Murray.

In the superior court, Murray's post-conviction relief attorney relied on several court decisions holding that defense attorneys are sometimes ethically required to act directly contrary to their clients' wishes, even in matters where Rule 1.2(a) says that the client's decision governs. But all of the cases cited by the post-conviction relief

attorney involved defendants who were sentenced to death, and who wished to acquiesce in that sentence even though they still had legal avenues for challenging it.

Cases of this type are addressed separately in the American Bar Association's annotation to Model Rule of Professional Conduct 1.14. *See* American Bar Association, *Annotated Model Rules of Professional Conduct* (Seventh Edition, 2011), Annotation to Model Rule 1.14, p. 237 ("Criminal Proceedings") and pp. 237-38 ("Client's Refusal to Contest Death Penalty").

The ABA's discussion of Rule 1.14 (as it applies to criminal cases) focuses on the problem of what a defense attorney should do when the attorney has good reason to believe that their client is incompetent. The annotation suggests that death penalty cases fall into a special category because, when a client decides to forego legal challenges to a death sentence, that very decision (by itself) may potentially provide the lawyer with good reason to conclude that the client is incompetent and suicidal. *Ibid.* Thus, the lawyer may have an ethical duty to disregard the client's expressed wishes.

But, as we have explained, Murray is *not* claiming that he was incompetent to make decisions about the plea agreement.

Nor is this a situation where Murray's attorney ignored his mental illness or disregarded the principles codified in Rule 1.14(b). Murray's trial attorney was aware that Murray was mentally ill — and, for this reason, she followed the precept of Rule 1.14(b) by "consulting ... individuals ... [who had] the ability to take action to protect [her] client". Specifically, she retained a mental health professional to observe and aid Murray during the criminal case.

The record shows that Murray's trial attorney strongly disputed the wisdom of her client's decision to plead guilty, and that she did her best to dissuade him from a course of action that was seemingly so contrary to his interests — but Murray insisted. Murray does not now assert that he was incompetent to make this decision. And if

Murray was competent, both Rule 1.2(a) and Rule 1.14(a) directed Murray's trial attorney to honor his wishes with respect to what plea to enter, and whether to offer or accept a plea bargain.

See, e.g., *People v. Howard*, 824 P.2d 1315, 1346-47 (Cal. 1992) (rejecting a claim of ineffective assistance of counsel when, in a capital case, the defense attorney honored the defendant's decision not to present a mitigation case during the penalty phase, since there was no doubt that the defendant was competent, and because the defendant's preference for a death sentence does not, by itself, raise a reasonable doubt as to the defendant's competence); *People v. Medina*, 799 P.2d 1282, 1300-01 (Cal. 1990) (holding that there was no error where a competent defendant first withdrew an insanity plea, then reinstated this plea against the advice of counsel; the court held that a presently sane defendant has control over this decision); *Ancona v. Warden*, unpublished, 2009 WL 1958728, *8-12 (Conn. Super. 2009) (rejecting a claim that the attorney representing a mentally ill defendant who faced up to 120 years' imprisonment on sexual assault charges violated Connecticut Professional Conduct Rule 1.14 by failing to petition the court to appoint a guardian for the defendant, after the defendant rejected a plea agreement that would have allowed him to serve only 2 years (10 years with 8 years suspended)).

(*But see* Christopher Slobogin & Amy Mashburn, *The Criminal Defense Lawyer's Fiduciary Duty to Clients with Mental Disability*, 68 Fordham Law Review 1581 (1999). The authors suggest that there may be "narrow circumstances" in which a lawyer should disregard or override a competent client's decision — circumstances where an admittedly competent defendant's decision-making is so impaired and so self-defeating as to jeopardize "compelling state interests in assuring the reliability or dignity of the proceedings". *Id.* at 1585.)

Thus, even assuming that Professional Conduct Rule 1.14 helps to define the pertinent standard of competent representation, and viewing the record in the light most favorable to Murray's claim, Murray's attorney abided by Rule 1.14(b) when she retained a mental health professional to help Murray cope with his mental illness and to give her insight into Murray's level of competence. Murray does not claim that he lacked competence to plead guilty. Accordingly, his attorney was not required to go further and affirmatively prevent him from entering his plea. Even if we were to adopt the view of the authors cited in the preceding paragraph, this is not a situation where Murray's decision was so nonsensical or outrageous as to jeopardize the fundamental reliability or dignity of the judicial proceedings.

We therefore uphold the superior court's ruling that Murray's petition for post-conviction relief failed to state a prima facie case for relief.

*Conclusion*

The judgement of the superior court is AFFIRMED.