NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>*Pacific Reporter*</u>. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| TERRY ANTHONY CLAYTON, | Court of Appeals No. A-13013 |
| Appellant, | Trial Court No. 3AN-15-10248 CI |
| v. | |
| STATE OF ALASKA, | O P I N I O N |
| Appellee. | No. 2755 — August 18, 2023 |

Appeal from the Superior Court, Third Judicial District, Anchorage, Jennifer Henderson, Judge.

Appearances: Jane B. Martinez, Law Office of Jane B. Martinez, LLC, Anchorage, under contract with the Office of Public Advocacy, for the Appellant. Timothy W. Terrell, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, and Wollenberg and Harbison, Judges.

Judge ALLARD.

In 1987, Terry Anthony Clayton was convicted of first-degree murder for the shooting death of Lisa Haverling. This Court affirmed Clayton's conviction on

direct appeal in an unpublished memorandum decision.[1] In that decision, we referred to the evidence against Clayton as "overwhelming."[2]

In 2015, Clayton filed an application for post-conviction relief, claiming that the FBI hair and fiber analyst who testified at his trial had given erroneous testimony. The superior court dismissed the application as untimely on two independent grounds: (1) that it was not supported by "admissible" evidence, and (2) that it did not establish Clayton's "innocence" by clear and convincing evidence.

Clayton now appeals, arguing that the superior court erred in dismissing his application. We agree with Clayton that his application was supported by evidence in a form sufficient to survive a motion for summary dismissal. We also question whether the superior court may have applied an unduly stringent standard of "innocent" for purposes of AS 12.72.020(b)(2), the statutory exception to the statute of limitations for claims of newly discovered evidence. But for the reasons explained in this opinion, we conclude that — even applying the lower standard advocated by Clayton — Clayton has failed to establish a prima facie case of timeliness under the statutory exception.

We therefore affirm the superior court's order of dismissal.

*Underlying facts and proceedings related to Clayton's trial*

In 1987, following a jury trial, Clayton was convicted of the murder of Lisa Haverling and sentenced to a term of imprisonment of 99 years. We summarized the case against Clayton in his direct appeal, and we briefly restate the facts here.

Haverling's body was found in her apartment, face down with a rope around her legs and hands. She had been shot twice in the back of the head. She had a stab wound in her lower back, and her left wrist had been cut. Police found no signs of

---

[1] *Clayton v. State*, 1989 WL 1594949, at *3-4 (Alaska App. May 3, 1989) (unpublished).

[2] *Id.* at *3.

a forced entry or sexual assault, but Haverling was missing two rings, one of which was described by her friend as distinctive. The police found a .25 caliber shell casing underneath the bed.

The police subsequently received an anonymous tip that Terry Clayton had murdered Haverling. Eventually, the police contacted Henry Mason, a close friend of Clayton's. Mason told the police that his wife had provided the anonymous tip, and that he had been the source of her information. Mason agreed to cooperate with the police.

Mason reported that Clayton, who lived in an apartment building located adjacent to Haverling's, had previously spent an afternoon with Haverling and learned that she had money. According to Mason, Clayton said, "She's gone and she's mine." Clayton and Mason had previously committed burglaries together, and Mason told the police that he assumed Clayton intended to burglarize Haverling's apartment.

Mason later confronted Clayton about the murder. According to Mason, Clayton initially denied committing the murder but ultimately confessed to the killing. Mason said that Clayton told him that he had gone into Haverling's apartment and waited until she returned for lunch. He then surprised her and demanded that she write him two checks, one for $1,700 and one for $800. Mason testified that Clayton said he took Haverling upstairs, sexually assaulted her, and then tied her up. Clayton said he intended to leave at that point, but that he then decided to look more closely at Haverling's checkbook. He noticed that Haverling had written the checks out of sequence, in the middle of the checkbook. Clayton said that he became enraged and returned upstairs and shot Haverling.

After examining Haverling's checkbook, the police found that a check had been torn from the center of the book. At trial, the State introduced evidence that the check was written in Haverling's handwriting to Clayton for $800.

The police obtained a warrant to search Clayton's rented storage locker. In the locker, the police found both a .25 caliber pistol and a knife in a box with

Clayton's fingerprints on it. FBI laboratory technicians testified that the bullets used to kill Haverling were discharged from this pistol, and that there were spots of human blood on both the knife and the pistol. (When interviewed, Clayton admitted that he owned a gun and knife similar to the ones found in his storage locker, but he stated that he had used the knife to cut steak.)

The police also discovered that Clayton had pawned a distinctive ring three days after the murder; one of Haverling's co-workers identified the ring as Haverling's. (When questioned about the ring, Clayton told the police that he had pawned the ring, but claimed he had obtained it in a drug deal a month prior.)

A witness who lived across the street from Clayton later testified at trial that Clayton's car was in the parking lot of the apartment complex all morning on the day of the murder, and that he saw Clayton come out of his apartment around 1:15 p.m. — just past the lunch hour during which Haverling was murdered.

The State also introduced the testimony of FBI Special Agent Chester Blythe, who conducted hair and fiber analysis on hairs recovered from Haverling's body and Clayton's clothing.

For the most part, Agent Blythe was very moderate in his claims. Blythe testified that microscopic hair comparisons could not be used to identify a person to the exclusion of others because "[t]his is not a positive association like a fingerprint." He also acknowledged that there was "no reliable study or statistic available" that could provide a percentage likelihood that two hairs were from the same person.

In accordance with these recognized limits, Blythe testified that a hair recovered from the sweatpants Clayton was wearing during his arrest resembled a pubic hair and that the hair was "consistent" with Haverling's and "could have come from her." Blythe also testified that wool fibers found on Clayton's jacket and pants were "consistent with" wool fibers that were taken from Haverling's skirt — noting that they "exhibited the same characteristics" and were both from a black sheep whose wool remained black even after the dyes were eliminated from the fiber. Lastly, Blythe

testified that there were hairs on Clayton's jacket that were "consistent with" hairs taken from Haverling's cats.

But despite acknowledging the limits of microscopic hair comparison analysis, Agent Blythe also made statements that seemed to suggest that a positive identification could be made to the exclusion of others and that a percentage could be assigned to the likelihood of a match. Blythe testified, for example, that it was "likely" that the pubic hair found on Clayton's clothes belonged to Haverling, and he put the percentage of that likelihood as "a lot higher" than fifty percent. The State relied on Blythe's testimony at closing, offering the hair and fiber evidence as proof that Clayton had been in Haverling's apartment.

Clayton's defense at trial was that Mason had framed Clayton for the murder and that Mason was Haverling's real killer. Clayton presented evidence that Mason had a key to his storage locker (although there was also testimony suggesting that it would have been very difficult for Mason to have gained access to the storage locker area without Clayton being present). Clayton attacked Mason's credibility and the fact that he had been granted immunity for multiple unrelated property and drug crimes in exchange for his testimony.

Clayton also relied on a part of Agent Blythe's hair and fiber testimony that was favorable to Clayton. At trial, Blythe testified that he recovered a foreign hair from Haverling's dead body that was "consistent with" hair taken from Henry Mason, although it was longer than Mason's current hair style. Clayton introduced evidence that Mason shaved his head after the murder occurred, and Clayton used Agent Blythe's testimony to support his defense that Mason had killed Haverling and then "set up" Clayton by planting other evidence that incriminated Clayton.

The jury rejected this defense and found Clayton guilty of first-degree murder.

*Post-conviction relief proceedings*

Around 2013, the FBI, the Innocence Project, and the National Association of Criminal Defense Lawyers began reviewing testimony and lab reports by FBI examiners involving microscopic hair analysis. In particular, the FBI identified some FBI examiners who had given testimony that "exceeded the limits of science by overstating the conclusions that may appropriately be drawn from a positive association between evidentiary hair and a known hair sample." Clayton was notified of this review in 2015 because Agent Blythe, the FBI hair analyst who testified in his case, was one of the criticized examiners.

In response, Clayton filed a *pro se* application for post-conviction relief and was appointed an attorney to help him with the post-conviction relief process. Clayton's application was filed nineteen years after the statute of limitations had expired.[3]

In 2016, the FBI sent a letter to the State of Alaska stating that it had reviewed the testimony of Agent Blythe in Clayton's case, and that it had concluded that certain statements in Blythe's microscopic hair testimony "exceeded the limits of the science." The letter indicated that the Innocence Project and the National Association of Criminal Defense Lawyers had also independently reviewed Blythe's testimony and they agreed with the FBI's conclusions. The letter was signed by Special Counsel Norman Wong and it included unsigned reports documenting the results of the FBI review and the independent review by the Innocence Project and the National Association of Criminal Defense Lawyers.

The FBI letter made clear that "[t]he science underlying microscopic hair comparison [was] not the subject of this review." Instead, the review was targeted at

---

[3] In 1995, the legislature instituted a two-year statute of limitations on most post-conviction relief claims (which was later lowered to eighteen months). The bill included a provision allowing anyone with a conviction date prior to July 1994 to file a claim before July 1996. C.S.H.B. 201, § 40, 19th Leg. 1st Sess. (1995).

FBI examiners who exceeded the limits of science "by overstating the conclusions that may appropriately be drawn from a positive association between evidentiary hair and a known hair sample." The letter compared these types of errors to "cases in which the FBI Laboratory report and examiner testimony presented conclusions that may appropriately be drawn from a positive association."

The letter indicated that Agent Blythe's testimony contained two types of errors: (1) it stated or implied that the evidentiary hair could be associated with a specific individual to the exclusion of all others; and (2) it assigned to the positive association a statistical weight or probability or provided a likelihood that the questioned hair originated from a particular source, or an opinion as to the likelihood or rareness of the positive association that could lead the jury to believe that valid statistical weight could be assigned to a microscopic hair association.

The FBI letter noted that, in federal cases, the United States Department of Justice was waiving reliance on the statute of limitations and other procedural-default defenses in order to permit the resolution of post-conviction relief claims based on similar erroneous testimony.

Clayton's attorney subsequently filed an amended application for post-conviction relief, arguing that the FBI letter constituted newly discovered evidence that required Clayton's conviction to be vacated in the interests of justice. The attorney also argued that the tainted FBI testimony had undermined the fundamental fairness of Clayton's trial and violated Clayton's state and federal due process rights. The amended application did not acknowledge that the statute of limitations had expired nineteen years earlier.

The State filed a motion to dismiss Clayton's application as untimely. In its motion to dismiss, the State made clear that, unlike the federal government, it was not waiving any statute of limitations or procedural defenses to these post-conviction relief claims based on allegedly tainted FBI expert testimony. The State therefore pointed out that, in order for Clayton's application to be accepted as timely under

Alaska law, Clayton needed to meet the requirements of AS 12.72.020(b)(2), the statutory exception to the statute of limitations for post-conviction relief claims based on newly discovered evidence. Under this provision, a court may hear an application for post-conviction relief that falls outside the statute of limitations if the application is:

> (2) based on newly discovered evidence if the applicant establishes due diligence in presenting the claim and sets out facts supported by evidence that is admissible and
>
> > (A) was not known within
> >
> > > (i) 18 months after entry of the judgment of conviction[;]
> >
> > (B) is not cumulative to the evidence presented at trial;
> >
> > (C) is not impeachment evidence; and
> >
> > (D) establishes by clear and convincing evidence that the applicant is innocent.[4]

The State argued that Clayton had failed to meet this standard in two different ways. As an initial matter, the State argued that the FBI letter and attached reports were unsworn hearsay, and that Clayton's application was therefore not supported by "admissible" evidence. The State also separately argued that the FBI letter was "mere impeachment" and it did not undermine the State's case in any significant way,[5] and it did not establish by clear and convincing evidence that Clayton was actually innocent.

In response, Clayton argued that the reports he submitted were admissible as business records, and he asserted that he would be unable to procure affidavits or

---

4    AS 12.72.020(b)(2).

5    *Mooney v. State*, 167 P.3d 81, 91 (Alaska App. 2007) (explaining that, in the post-conviction relief context, impeachment evidence "simply reinforces the types of impeachment that were previously available," whereas newly discovered evidence that "undermines the government's case in a new and significant way . . . is not 'merely impeaching'").

other information from the FBI until the discovery phase of litigation. Clayton also argued that he was not required to meet the statutory standard under AS 12.72.020(b)(2); instead, he claimed that he was only required to meet the standard used for timely motions for new trial based on new evidence. This standard — commonly referred to as the *Salinas* standard based on the Alaska Supreme Court case *Salinas v. State* — is very similar to the standard under AS 12.72.020(b)(2), with one important difference.[6] The *Salinas* standard does not require a defendant to establish by clear and convincing evidence that they are "innocent." Instead, it requires the defendant to show that the newly discovered evidence would "probably produce an acquittal" (when considered with the totality of evidence that would be available at a new trial).[7]

The superior court rejected both of Clayton's arguments and granted the State's motion to dismiss. The court ruled first that the FBI documents did not qualify as "business records" under the hearsay exception, and that Clayton had therefore failed to support his application with "admissible" evidence. The court also ruled that, even if admissible, the FBI letter and reports did not establish by clear and convincing evidence that Clayton was "innocent." The superior court did not explain what Clayton would have to show to establish his innocence under this standard, although the court made clear that the standard was higher than the *Salinas* "probably produce an acquittal"

---

[6]  The *Salinas* standard asks whether the evidence (1) is, in fact, newly discovered; (2) was discovered with reasonable diligence on the part of the movant; (3) is not merely cumulative or impeaching; (4) is material to the issues involved; and (5) would probably produce an acquittal. *Salinas v. State*, 373 P.2d 512, 514 (Alaska 1962).

[7]  *See id.* at 514-15 (asking whether the newly discovered evidence was so material that it would probably produce an acquittal in a new trial); *see also James v. State*, 84 P.3d 404, 407 (Alaska 2004) (remanding post-conviction relief case for express findings on whether newly discovered evidence would probably produce an acquittal because "the superior court neither explicitly nor implicitly stated the likely effect of the recantation evidence on a jury at a new trial").

standard that applied to motions for new trial and timely post-conviction relief applications.

Following the court's order, Clayton filed a motion for reconsideration, arguing that the court had failed to address his due process claims. The superior court issued a handwritten order, ruling that the motion for reconsideration was untimely and that any constitutional claims had been waived for inadequate briefing. The court also noted that by applying the statute of limitations under AS 12.72.020, it had implicitly rejected any argument that the statute was unconstitutional as applied to Clayton's case.

This appeal followed.

*Why we conclude that the FBI letter and accompanying reports would have been sufficient to sustain Clayton's initial burden at the pleading stage*

Clayton first claims that the superior court erred by dismissing his application for lack of evidentiary support. Clayton argues that, at this preliminary stage of the post-conviction relief proceeding, the FBI letter and attached reports were sufficiently trustworthy to qualify as "admissible" evidence for purposes of AS 12.72.020(b)(2). We agree.

On appeal, the State argues that Clayton should have used the Freedom of Information Act to obtain information from the FBI regarding the authors of the report. But it is not clear how realistic this option would have been.[8] The State also argues that Clayton should have secured his own microscopic hair analysis expert who could then have submitted an affidavit attesting to the same conclusions that the FBI analysts reached. But arguably such an affidavit would be no more "admissible" than the FBI documents in the sense that affidavits, although sworn, are not directly admissible at

---

[8] *See, e.g.*, *Kuplen v. U.S. Dep't of Justice*, 2013 WL 5476566 (W.D.N.C. Oct. 2, 2013) (unpublished) (discussing Freedom of Information and Privacy Act request involving Agent Blythe where the FBI refused to provide records).

trial.[9] Courts nevertheless accept affidavits as sufficient to meet a pleading standard because they are generally accepted as reliable evidence that the true evidence — *i.e.*, the live testimony — will be available at trial.[10]

Here, Clayton was relying on documents created by the federal government that had been originally sent to the State and whose authenticity was not in doubt. Clayton's burden at this preliminary stage of the proceeding was to present well-pleaded assertions of fact which, if ultimately proven, would establish that he is entitled to relief.[11] The FBI letter and accompanying reports, although unsworn, were sufficient to demonstrate that Clayton could produce admissible evidence to support his claim that Agent Blythe's testimony was tainted by error, even if he was unable to provide the identity of the person who might provide that evidence at a future evidentiary hearing or retrial. Indeed, the FBI letter was an admission of flawed testimony by a governmental agency that testified on behalf of the State at Clayton's trial; this admission was presumably against the agency's self-interest and thus sufficiently trustworthy to qualify as admissible under the residual hearsay exception, at least for purposes of fulfilling Clayton's initial pleading requirement.[12]

---

[9] *See Greenway v. Heathcott*, 294 P.3d 1056, 1065 (Alaska 2013) (describing witness affidavits as "quintessentially hearsay and suspect evidence" and upholding trial court's decision to decline to accept affidavits in lieu of testimony subject to cross-examination).

[10] *Cf. Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) ("At the summary judgment stage, evidence need not be submitted 'in a form that would be admissible at trial.' Parties may, for example, submit affidavits in support of summary judgment, despite the fact that affidavits are often inadmissible at trial as hearsay, on the theory that the evidence may ultimately be presented at trial in an admissible form." (citations omitted)).

[11] Alaska R. Crim. P. 35.1(d); *LaBrake v. State*, 152 P.3d 474, 480 (Alaska App. 2007).

[12] *See* Alaska R. Evid. 803(23), 804(b)(5) (residual hearsay exception for statements with "circumstantial guarantees of trustworthiness" on par with listed hearsay exceptions);

Under the residual hearsay exception, a statement that has "equivalent circumstantial guarantees of trustworthiness" as other exceptions to the hearsay rule is considered admissible if the court determines that:

> (a) the statement is offered as evidence of a material fact; (b) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (c) the general purposes of these rules and the interest of justice will best be served by admission of the statement into evidence.[13]

Here, Clayton's attorney asserted that it was difficult to obtain the names of the reviewers at this early stage of the post-conviction relief proceedings, but that these names would be easier to obtain in the second stage of the proceedings, when Clayton would have access to discovery tools and the power of the court. Given this, and given the circumstantial guarantees of trustworthiness that the FBI letter otherwise provided, we conclude that Clayton's application should not have been dismissed on the ground that he had failed to present an adequate evidentiary basis for his claims.

*Why we conclude that Clayton's application was properly dismissed and that he failed to meet his burden under AS 12.72.020(b)(2), regardless of how that burden is construed*

Under Alaska law, a defendant may move for a new trial based on newly discovered evidence within 180 days of their final judgment.[14] These claims are evaluated under the standard first announced in 1962 by the Alaska Supreme Court in *Salinas v. State*: whether the evidence (1) is, in fact, newly discovered; (2) was discovered with reasonable diligence on the part of the movant; (3) is not merely

---

*see also* Alaska R. Evid. 804(b)(3) (hearsay exception for statements against interest); *cf.* Alaska R. Evid. 801(d)(2) (admission of party opponent is not hearsay).

[13]   Alaska R. Evid. 803(23).

[14]   Alaska R. Crim. P. 33(c).

cumulative or impeaching; (4) is material to the issues involved; and (5) would probably produce an acquittal.[15] As we observed in *Mooney v. State*, almost every jurisdiction in the country uses a test essentially identical to the *Salinas* test in the new trial context.[16]

Both the Alaska Supreme Court and this Court have applied this same *Salinas* test in the context of *timely* post-conviction relief claims based on newly discovered evidence — *i.e.*, applications that are filed within the statute of limitations and brought under AS 12.72.010(4).[17] This statute provides that a person is entitled to post-conviction relief if "there exists evidence of material facts, not previously presented and heard by the court, that requires vacation of the conviction or sentence in the interest of justice."[18] Thus, a defendant who files a timely application for post-conviction relief based on newly discovered evidence is entitled to vacation of their conviction in the interests of justice if they can prove, *inter alia*, that the newly discovered evidence would "probably produce an acquittal" when evaluated as part of the totality of the evidence that would be available at a new trial.[19] The State does not contest that the *Salinas* standard applies to these timely post-conviction relief claims.

---

[15] *Salinas v. State*, 373 P.2d 512, 514 (Alaska 1962).

[16] *Mooney v. State*, 167 P.3d 81, 91 (Alaska App. 2007) (citing 5 Wayne R. LaFave et al., *Criminal Procedure* § 24.11(d), at 623-28 (2d ed. 1999)).

[17] *See Lewis v. State*, 901 P.2d 448, 450 (Alaska App. 1995) (holding that the *Salinas* test applies to newly-discovered evidence claims raised in an application for post-conviction relief under Criminal Rule 35.1(a)(4)); *see also James v. State*, 84 P.3d 404, 406 (Alaska 2004) (discussing how to evaluate the impact of a recantation in assessing whether, in a post-conviction relief application, the recantation would "probably produce an acquittal," as required by the *Salinas* standard); *Mooney*, 167 P.3d at 83, 90-91 (applying the *Salinas* test in the context of a timely post-conviction relief application).

[18] AS 12.72.010(4); *see also* Alaska R. Crim. P. 35.1(a)(4).

[19] *James*, 84 P.3d at 407-08 (holding that newly discovered evidence "must be realistically evaluated in light of the totality of the evidence to be presented in the event of a retrial").

In the current case, Clayton argues that the same *Salinas* standard applies to otherwise untimely post-conviction relief claims based on newly discovered evidence that are brought outside the applicable statute of limitations. In other words, Clayton argues (essentially) that the statutory language contained in AS 12.72.020(b)(2)(D) — "establishes by clear and convincing evidence that the applicant is innocent" — should be construed as requiring no more than the "probably produce an acquittal" standard under *Salinas*. He further asserts that it would be unconstitutional to require anything more than the *Salinas* standard.

Clayton's arguments raise a question of first impression for this Court. Although this Court has discussed the possible meaning of AS 12.72.020(b)(2) in various unpublished cases, there are no published cases construing this statutory provision.[20] In particular, there are no published cases addressing what the legislature meant by the term "innocent" and whether that term was intended to convey something different than "not guilty." We note that in *Schlup v. Delo*, the United States Supreme Court observed that "proof beyond a reasonable doubt marks the legal boundary between guilt and innocence," and the Court defined a claim of "actual innocence" for purposes of the federal "actual innocence" gateway as requiring proof that "it is more likely than not that no reasonable juror would have convicted [the defendant] in light of the new evidence."[21] In reaching this conclusion, the Court stated that the adoption of

---

[20]  *See, e.g.*, *Fox v. State*, 2016 WL 6310766, at *1 (Alaska App. Oct. 26, 2016) (unpublished) (suggesting that defendant could establish his innocence by clear and convincing evidence if he proved that "his illegal act was actually the product of entrapment"); *Simpson v. State*, 2008 WL 4757150, at *2 (Alaska App. Oct. 29, 2008) (unpublished) (addressing but not resolving the meaning of "innocent" under AS 12.72.020(b)(2)); *State v. Finney*, 2001 WL 1448756, at *4 (Alaska App. Nov. 14, 2001) (unpublished) (suggesting that the standard under AS 12.72.020(b)(2) is "more stringent" than the "probably produce an acquittal" standard).

[21]  *Schlup v. Delo*, 513 U.S. 298, 327-28 (1995).

this standard "reflect[ed] the proposition, firmly established in our legal system, that the line between innocence and guilt is drawn with reference to a reasonable doubt."[22]

Other jurisdictions have likewise defined the term "innocent" or "innocence" in their post-conviction relief statutes to mean that the defendant would be found not guilty on a retrial. [23] Sometimes the term is used to mean not only that the defendant would be found not guilty of the underlying offense, but also that the defendant would be found not guilty of any accomplice liability or any lesser included

---

[22] *Id.* at 328.

[23] *See, e.g.*, *Schmidt v. State*, 909 N.W.2d 778, 795-98 (Iowa 2018) ("For an applicant to succeed on a freestanding actual-innocence claim, the applicant must show by clear and convincing evidence that, despite the evidence of guilt supporting the conviction, no reasonable fact finder could convict the applicant of the crimes for which the sentencing court found the applicant guilty in light of all the evidence, including the newly discovered evidence."); *Riley v. State*, 819 N.W.2d 162, 170 (Minn. 2012) ("[E]stablishing actual innocence requires evidence that renders it more likely than not that no reasonable juror would convict."); *People v. Morgan*, 817 N.E.2d 524, 527 (Ill. 2004) ("Our court has therefore recognized the right of postconviction petitioners to assert a claim of actual innocence based on newly discovered evidence. To win relief under that theory, the evidence adduced by the defendant must . . . be of such conclusive character that it would probably change the result on retrial." (citations omitted)); *Haas v. Commonwealth*, 871 S.E.2d 257, 276-77 (Va. 2022) ("A person seeking a writ of actual innocence . . . must prove [by a preponderance of the evidence] that the evidence on which his petition is based . . . is material and, when considered with all of the other evidence in the current record, will prove that no rational trier of fact would have found proof of guilt . . . beyond a reasonable doubt." (citations omitted)).

offense.[24] This is similar to the definition of "innocence" contained in AS 12.73, Alaska's post-conviction DNA testing statute.[25]

However, in Clayton's case, the superior court appeared to assume that "innocent" meant something other than "not guilty." According to the superior court, it was not enough for Clayton to show that the new evidence would probably have produced an acquittal at trial in the sense that the jury would have reached a different verdict; instead, the court stated that Clayton needed to meet "the higher burden of establishing innocence."

It is not clear what the superior court meant when it referred to a "higher burden of establishing innocence." It is possible the court meant only to highlight the difference between the *Salinas* preponderance of the evidence standard and the "clear and convincing" burden of proof required by AS 12.72.020(b)(2).[26] It is also possible that the court was applying the "higher burden" of proving that the defendant would not only be found not guilty of the underlying crime, but also would be found not guilty as an accomplice or of any lesser included offense.[27] Alternatively, it is possible that the superior court was interpreting "innocence" as requiring some sort of affirmative

---

[24] *See, e.g.*, La. Code Crim. Proc. Ann. art. 926.2 (2021) (defining finding of "factual innocence" to require that new evidence establish that "no rational juror would have found the petitioner guilty beyond a reasonable doubt of either the offense of conviction or of any felony offense that was a responsive verdict").

[25] *See* AS 12.73.090(2) (defining "innocence" for purposes of post-conviction DNA statute as meaning that "the applicant was not a perpetrator of or an accomplice to the offense or lesser included offense for which the applicant was convicted").

[26] *Geisler v. State*, 2021 WL 3179639, at *1 n.6 (Alaska App. July 28, 2021) (unpublished) (citing *State v. Finney*, 2001 WL 1448756, at *4 (Alaska App. Nov. 14, 2001) (unpublished)) (referring to the standard for untimely post-conviction relief applications as "more stringent" than the standard for timely post-conviction relief applications).

[27] *See* AS 12.73.090.

showing beyond simply proving that the defendant would be found "not guilty" at any new trial.

We conclude that we need not resolve this question here because we are convinced that Clayton is not entitled to relief regardless of what the word "innocent" means. In other words, even if Clayton is correct and the language in AS 12.72.020(b)(2)(D) — "establishes by clear and convincing evidence that the applicant is innocent" — requires only that the defendant show that the newly discovered evidence would "probably produce an acquittal" under the *Salinas* standard, we would still conclude that Clayton has failed to meet this burden.

As we stated in our decision in Clayton's direct appeal, "the evidence against Clayton was overwhelming" and there was "substantial physical evidence connecting Clayton to the crime scene."[28] This physical evidence not only included the hair and fiber analysis contained in Agent Blythe's testimony, but also included evidence of the gun and knife found in Clayton's storage locker, evidence that a check written from Haverling's checkbook had Clayton's name on it, and evidence that Clayton pawned Haverling's distinctive ring three days after her murder.

Moreover, although Clayton asserts that none of Agent Blythe's testimony would be admissible at a new trial, there is little reason to believe that would be true. As already explained, the FBI letter made clear that it was not invalidating all expert testimony related to microscopic hair comparisons; instead, it was only invalidating expert testimony that "exceeded the limits of science" — *e.g.*, testimony that erroneously claimed that a positive identification to the exclusion of others could be

---

[28] *Clayton v. State*, 1989 WL 1594949, at *3 (Alaska App. May 3, 1989) (unpublished).

made or that erroneously ascribed a particular percentage to the likelihood that a positive identification could be made.[29]

A review of Agent Blythe's testimony at Clayton's trial reveals that, for the most part, Agent Blythe did not make such erroneous claims.[30] Indeed, as already explained, Agent Blythe largely acknowledged that microscopic hair comparison could not yield a positive association to the exclusion of any other source. And although he claimed at a couple points in his testimony that it was "likely" that the pubic hair found on Clayton's clothing belonged to Haverling, he also acknowledged that there were no statistics or percentages that actually applied to microscopic hair comparisons.

In addition, the erroneous statements identified by the FBI reports were only made in relation to the pubic hair. Agent Blythe did not make any such erroneous claims with regard to the cat hairs or the wool fibers. Instead, his testimony was simply that the cat hairs found on Clayton's clothing were "consistent with" hairs taken from Haverling's cats. And he similarly testified that the wool fibers found on Clayton's clothing were "consistent with" the wool fibers taken from Haverling's skirt, explaining that he reached this conclusion because the fibers "exhibited the same characteristics" and because they retained their blackness even after the dye was eliminated from the fibers (which suggested that they both came from a black sheep). Notably, there is nothing in the FBI letter or the associated reports (both of which addressed only errors

---

[29] We note that, by limiting his evidentiary support for his claims to the FBI letter and the accompanying reports, Clayton limited his criticisms of Agent Blythe's microscopic hair and fiber analysis to the criticisms contained in those documents.

[30] *See, e.g.*, *Crump v. May*, 2023 WL 2240289, at *5-6 (D. Del. Feb. 27, 2023) (unpublished) (noting, in case with similarly tainted hair testimony, that the FBI letter would not probably produce an acquittal where the expert also made equivocating statements along the same lines as Agent Blythe did here).

in microscopic *hair* comparison analysis) that discredits this part of Agent Blythe's testimony.[31]

In any case, even if we assume that the majority of Agent Blythe's testimony would not be introduced at a new trial, the jury would still likely hear at least some expert testimony regarding the hairs and fibers found on Clayton's clothing. Moreover, this evidence would be presented along with all the other evidence used to convict Clayton, which included: Henry Mason's testimony regarding Clayton's alleged confession; the $800 check made out to Clayton that seemingly corroborates the confession; the discovery of the gun that was used to shoot Haverling in Clayton's storage locker; Clayton's admissions that the gun belonged to him; Clayton's admission that the knife that was found in the storage locker with the gun also belonged to him and his claim that the blood on the knife was from cutting steak; evidence that Clayton was seen at the apartment complex around the time of the murder; and evidence that Clayton pawned one of Haverling's distinctive rings a few days after the murder.

Given all this, we conclude that Clayton's pleadings failed to show that the newly discovered evidence contained in the FBI letter and the accompanying reports would probably produce an acquittal at a new trial. In sum, although it is an open question what "establishes by clear and convincing evidence that the applicant is innocent" actually means under Alaska law, we need not decide that issue in this case because Clayton has failed to show that he is entitled to relief even under the lower *Salinas* standard that he advocates.

---

[31] *Cf. McCartney v. Warden*, 2016 WL 11811648, at *2 (W.D. La. Jan. 5, 2016) (unpublished) (distinguishing between tainted FBI hair analysis and untainted FBI fiber analysis).

*Clayton's due process arguments*

In the proceedings before the superior court, Clayton's post-conviction relief attorney made a number of vague constitutional claims under the due process clause. The superior court later dismissed these claims as inadequately briefed. We likewise conclude that Clayton has failed to sufficiently articulate his due process claims on appeal. We nevertheless address them here to the extent we can based on the briefing we have received.

First, to the extent that Clayton is arguing that AS 12.72.020(b)(2) is unconstitutional because it requires a higher standard than the *Salinas* "probably produce an acquittal" standard, this argument is moot because Clayton has failed to show that he can meet the *Salinas* standard.

Second, to the extent that Clayton is arguing that due process is violated when tainted expert testimony renders a trial "fundamentally unfair," we conclude that Clayton has failed to show that the tainted FBI testimony rendered his trial fundamentally unfair.[32] As already explained, the erroneous statements comprised only a small part of Agent Blythe's testimony, and the majority of his testimony would likely be allowed in any new trial. Moreover, Clayton's conviction was supported by significant evidence separate from Agent Blythe's testimony, and Clayton has failed to show that the outcome of his case would have been different even without Agent Blythe's testimony.

Lastly, to the extent that Clayton is arguing that due process was violated because the State "knew or should have known" that it was introducing "false or perjured" testimony, we find this claim unpreserved.[33] On appeal, Clayton cites to a

---

[32]    *See United States v. Berry*, 624 F.3d 1031, 1041-42 (9th Cir. 2010) (refusing to find a trial fundamentally unfair where expert used significantly criticized, though not wholly unreliable, analytical methods but expert's "conclusions were not overstated").

[33]    *Cf. Napue v. Illinois*, 360 U.S. 264 (1959) (holding that a defendant is deprived of a fair trial when (1) the government introduces false or misleading testimony or allows it

federal decision, *United States v. Ausby*, in which a federal court granted habeas relief to a defendant because the federal government conceded that it knew or should have known that the microscopic hair analysis it introduced at trial was false.[34] But the State has made no such concession here, and Clayton's post-conviction relief attorney failed to even allege that the State knew or should have known of the problems with Agent Blythe's testimony when he filed Clayton's amended application for post-conviction relief. Clayton's reliance on *Ausby* and the related authority in his briefing is therefore misplaced.

*Conclusion*

The superior court's order dismissing Clayton's application for post-conviction relief is AFFIRMED.

---

to go uncorrected, (2) the government knew or should have known that the testimony was false, and (3) the false evidence was material to the conviction).

[34]  *United States v. Ausby*, 916 F.3d 1089, 1095 (D.C. Cir. 2019).